Floyd V. HENO, Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant, Appellee.

No. 92–1936.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1993.

Decided June 10, 1993.

430

Before BREYER, Chief Judge, CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiff Floyd Heno and two of his daughters appeal a district court order dismissing their claims for compensatory and injunctive relief against the Federal Deposit Insurance Corporation ("FDIC").[1] We affirm the district court's dismissal, 815 F.Supp. 507, of the claim for injunctive relief pursuant to Federal Rule of Civil Procedure 12(b)(6), but vacate its Rule 12(b)(1) order dismissing the claim for compensatory relief due to lack of jurisdiction, and remand the latter claim for further proceedings.

## I

### BACKGROUND

We review a Rule 12(b)(6) dismissal *de novo,* crediting all allegations in the complaint and drawing all reasonable inferences favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Rumford Pharmacy, Inc. v. East Providence,* 970 F.2d 996, 997 (1st Cir.1992). Similarly, a Rule 12(b)(1) dismissal is reviewed *de novo* where, as here, only the legal sufficiency of the undisputed jurisdictional facts is at issue. *See Eaton v. Dorchester Dev., Inc.,* 692 F.2d 727, 732 (11th Cir.1982); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

The complaint alleges that plaintiff Heno sold Balcol Corporation a 104–acre parcel of undeveloped real estate in 1986, for which Balcol gave Heno a promissory note secured by a first mortgage. In September 1987, Balcol began to develop the property, known as the "Prospect Heights" residential subdivision, and obtained construction financing through Home National Bank of Milford ("Bank"). Heno agreed to subordinate his first mortgage to the Bank's construction loan mortgage. Balcol and the Bank agreed to release $19,125 from the lot-sale proceeds

Robert G. Wilson IV with whom Robert G. Wilson III and Law Offices of Robert G. Wilson III, Boston, MA, were on brief, for plaintiff, appellant.

Robert R. Pierce with whom Russell F. Conn and Conn, Kavanaugh, Rosenthal & Peisch, Boston, MA, were on brief, for defendant, appellee.

1. As the claims at issue on appeal relate only to Heno, we make no further reference to the other plaintiffs.

in return for the release of Heno's second mortgage lien as each lot was sold.

By April 1990, Balcol and Prospect Heights were experiencing financial difficulties, and the three principal parties entered into a recapitalization agreement. Heno agreed to accept $5,000 (rather than $19,125) per lot for releasing his second mortgage on the next nine lots sold by Balcol. In return, Balcol and the Bank agreed: (1) to transfer two additional lots to Heno (Lots 82 and 111), free and clear of the Bank's first mortgage liens, at the time Heno released his second mortgage on the ninth lot; and (2) to deposit the net proceeds from the nine lots in escrow with the Bank. The escrow monies were to be used exclusively for the immediate completion of roadwork at the project and to defray Balcol's first mortgage *interest* payments to the Bank.

Although Balcol conveyed Lots 82 and 111 to Heno on May 2, 1990, the Bank did not release its first mortgage liens on the lots. During April and May 1990, seven of the nine original lots were sold by the Bank after Heno released his second mortgage liens. By June 1, 1990, more than $232,000 had been deposited in escrow with the Bank pursuant to the recapitalization agreement among Heno, Balcol, and the Bank. Ultimately, the eighth and ninth lots were sold, and the net proceeds, approximating $90,000, were deposited with FDIC.[2] The complaint alleges, hence we must assume, that $125,000

was to have been devoted to roadwork at the project.[3]

On June 1, 1990, the Bank was declared insolvent and FDIC was appointed receiver. At an unspecified later date, FDIC applied the escrow funds to the *principal* due on Balcol's first mortgage loan account with the Bank, contrary to the express terms of the recapitalization agreement. Heno's counsel thereafter held discussions with FDIC, and was informed by Balcol that FDIC would determine, after obtaining an appraisal of the Prospect Heights project, whether to release the Bank's first mortgage liens on the two additional lots at issue on appeal (lots 82 and 111). On December 13, 1990,[4] and again on February 19, 1991, Heno submitted written requests for action by the FDIC, but to no avail.[5] Subsequently, FDIC foreclosed on the Prospect Heights subdivision, including Lots 82 and 111. The escrow funds were neither redeposited nor applied to the agreed purposes.

On October 18, 1991, Heno brought the present action to enjoin FDIC's sale of Lots 82 and 111 and to compel it to redeposit the escrow monies previously misapplied to Balcol's first mortgage with the Bank. The complaint demanded an equitable accounting of the escrow monies, and compensatory relief for the loss occasioned by FDIC's refusal to release the Bank's first mortgage liens on Lots 82 and 111. FDIC moved to dismiss the claim for compensatory relief pursuant to Fed.R.Civ. 12(b)(1), and the claim for injunc-

---

2. The complaint does not specify the date(s) of these sales, but the proceeds were deposited with FDIC on or about October 1, 1990.

3. Although the record is silent, at oral argument Heno's counsel represented that the roadwork was never performed.

4. Heno's December 13 letter specifically sought release of the Bank's first mortgage liens on Lots 82 and 111 and served "notice of [Heno's] contingent interest in [the escrow account]." The letter went on to say:

> Heno should receive either the lot releases or that portion of the escrow account attributable to his participation in the agreement. *Under well established fiduciary and equitable principles, if the FDIC is not going to honor the purposes of the escrow account, that portion of the escrow account attributable to Heno's par-*

*ticipation should be returned to him, and not used by the Receiver to reduce Balcol's obligation.*
(Emphasis added.) Heno's complaint demands an equitable accounting of the escrow funds, and, accordingly, does not specify the exact amount claimed. However, were Heno to establish a repudiation of the recapitalization agreement, he might be expected to assert a claim for recovery of an amount equal to the difference between the $19,125 originally agreed upon, and the $5,000 which he later agreed to accept under the recapitalization agreement, for releasing his second mortgage liens on the nine lots sold by Balcol (or approximately $127,000).

5. The February 19, 1991 letter outlines, *inter alia*, the evidence relating to Heno's interest in the escrow monies and certain subdivision lots, and makes reference to other letters not included in the appellate record.

tive relief pursuant to Fed.R.Civ.P. 12(b)(6). The district court ruled that it lacked jurisdiction to consider the claim for compensatory relief by virtue of 12 U.S.C. § 1821(d)(13)(D)(i), and that injunctive relief was precluded by 12 U.S.C. § 1821(j).

## II

### *DISCUSSION*

Heno advances two contentions on appeal. First, he contends that neither subsection 1821(j), nor subsection 1821(d) (mandating that holders of "claims" against the assets of failed financial institutions lodge a timely administrative claim with FDIC as a prerequisite to judicial review), applies to "noncreditors"—like Heno—who assert claims for relief against FDIC in its own right, as distinguished from claims to assets of the insolvent financial institution itself.[6] Second, even if he were to be considered a "creditor" attempting to recover "assets" of the failed Bank, Heno contends that his claim for compensatory relief should not have been dismissed for failure to comply with the administrative claim procedure established under subsection 1821(d). With respect to the claim for compensatory relief, we agree.

The Financial Institutions Reform and Recovery Act ("FIRREA") regulates the filing, determination, and payment of claims against the assets of failed financial institutions after FDIC has been appointed receiver. The "task of interpretation begins with the text of the statute itself, and statutory language must be accorded its ordinary meaning." *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 706 (1st Cir.1992) (interpreting FIRREA § 1821(j)) (citations omitted). Subsections 1821(d)(3)(B) and (C) re-

quire FDIC to publish and mail notice of liquidation to "any creditor shown on the institution's books" and to provide at least ninety days for the filing of "claims." 12 U.S.C. § 1821(d)(3)(B) & (C). As FDIC points out, anyone with a "claim" against the assets of the failed institution must submit an administrative claim to FDIC within the prescribed statutory period. *Id.* § 1821(d)(5)(C). "[P]articipation in the administrative claims review process [is] mandatory for all parties asserting claims against failed institutions...." *Marquis v. Federal Deposit Ins. Corp.*, 965 F.2d 1148, 1151 (1st Cir.1992). Failure to participate in the administrative claim process is a "jurisdictional bar" to judicial review. *Id.; see also* 12 U.S.C. § 1821(d)(13)(D); *Federal Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 132 (3d Cir.1991) ("Congress expressly withdrew jurisdiction from all courts over any claim to a failed bank's assets that are [sic] made outside the procedure set forth in section 1821."). The subsection 1821(d) bar date for filing administrative claims in the present case was September 6, 1990. As the district court correctly found, Heno asserted no timely administrative claim under subsection 1821(d).

In contrast to subsection 1821(d), however, subsection 1821(e) expressly empowers the FDIC, as receiver, to repudiate contracts made by the failed financial institution prior to FDIC's appointment, where FDIC determines—in *its* "discretion," but within a "reasonable period" after its appointment—that repudiation of the failed financial institution's contract would "promote the orderly administration" of the failed institution's affairs. 12 U.S.C. § 1821(e)(1).[7] Although repudia-

---

**6.** Subsection 1821(j) provides, in part:

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, *to restrain or affect the exercise of powers or functions* of the Corporation *as a conservator or a receiver.*

12 U.S.C. § 1821(j) (emphasis added). Like the district court, we conclude that Heno's claim for injunctive relief is barred by subsection 1821(j). *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir.1992) ("holding that the district court lacks jurisdiction to *enjoin* the FDIC when the FDIC is acting pursuant to its

statutory powers as receiver") (emphasis added). Nevertheless, we note, without deciding, that § 1821(j)'s express language does not appear to bar *non*injunctive equitable relief against the FDIC, such as the accounting Heno seeks in conjunction with the claim for compensatory relief relating to the alleged misapplication of the escrow monies.

**7.** Subsection 1821(e)(1) provides as follows:

> **(e) Provisions relating to contracts entered into before appointment of conservator or receiver**
> **(1) Authority to repudiate contracts**

tion frees FDIC from performing the failed institution's contract, it constitutes a breach for which FIRREA affords the injured contracting party a direct claim for compensatory relief against FDIC. *Howell v. Federal Deposit Ins. Corp.*, 986 F.2d 569, 571 (1st Cir.1993). In most instances, monetary recoveries for FDIC's repudiation are "limited to actual direct compensatory damages." 12 U.S.C. § 1821(e)(3)(A)(i); [8] *see also Howell*, 986 F.2d at 572–75 (applying "actual direct compensatory damages" standard to "golden parachute" claim).

FIRREA's language, structure, and context indicate that subsections 1821(d) and (e) govern very different *types* of "claims". The

> In addition to any other rights a conservator or receiver may have, *the* conservator or *receiver* for any insured depository institution *may disaffirm or repudiate any contract or lease*—
> **(A)** *to which such institution is a party;*
> **(B)** the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
> **(C)** the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.
> 12 U.S.C. § 1821(e)(1) (emphasis added).

8. The term " 'actual direct compensatory damages' does not include—
> **(i)** punitive or exemplary damages;
> **(ii)** damages for lost profits or opportunity; or
> **(iii)** damages for pain and suffering."
> 12 U.S.C. § 1821(c)(3)(B).

9. Not only does the § 1821(e) claim repudiation provision stand in sharp contrast to the administrative claim procedure under § 1821(d), it closely resembles the analogous statutory provisions governing the assumption and rejection of executory contracts and unexpired leases in chapter 11 reorganization proceedings. *Compare* Bankruptcy Code § 365(a), (b)(1), (d)(2), (i), (j) & (k), 11 U.S.C. § 365(a), (b)(1), (d)(2), (i), (j) & (k), *with* 12 U.S.C. § 1821(c)(1), (2) & (3). *Cf. Howell*, 986 F.2d at 572.

Neither FIRREA nor its legislative history defines the term "claim," nor has FDIC issued regulations defining or clarifying its meaning. At least one other court has consulted analogous bankruptcy practice as a "promising source" for discerning congressional intent as to the meaning of the term "claim" under FIRREA. *See Office & Professional Employees Int'l Union, Local 2 v. Federal Deposit Ins. Corp.*, 962 F.2d 63, 68 (D.C.Cir.1992) (holding that union may file FIRREA claims for benefits on behalf of failed financial institution's employees, noting that

administrative claim allowance procedure established under subsection 1821(d) is inapposite to direct claims for FDIC's repudiation of a contract entered into by the failed financial institution *prior to the receivership.*[9] Subsection 1821(d) governs only claims against assets of the failed financial institution. Subsection 1821(e) authorizes claims for compensatory relief for direct loss occasioned by FDIC's repudiation of a pre-receivership contract entered into by the failed financial institution. *Cf. Homeland Stores, Inc. v. Resolution Trust Corp.*, No. 91–1304–PFK, 1992 WL 403092, 1992 U.S. Dist. LEXIS 20331 (D.Kan. Dec. 4, 1992).[10] Thus, unless Heno's claim is "against the assets" of

practice is routinely allowed under Bankruptcy Code).

Of course, no repudiation "claim" can "arise" against FDIC until it disaffirms or repudiates a claimant's preexisting contract with the failed financial institution. *Cf.* Bankruptcy Code § 502(g); 11 U.S.C. § 502(g) (governing post-bar date allowance of "claim[s] *arising* from the rejection ... of an executory contract") (emphasis added). FIRREA expressly grants FDIC a "reasonable period following [its] appointment" to "determine whether or not to exercise [its] rights of repudiation...." 12 U.S.C. § 1821(e)(2). Thus, the Bankruptcy Code definition of "claim" is plainly inapposite to a claim for repudiation against FDIC, as distinguished from the insolvent institution, their chapter 11 counterparts being the chapter 11 trustee and the debtor, respectively. The prepetition-claim filing deadlines established under the Bankruptcy Rules are inapplicable to postpetition "claims" against the chapter 11 trustee's counterpart (*i.e.*, FDIC), since, by definition, no claim against FDIC can have arisen until its appointment *and* its repudiation of the failed financial institution's preexisting contract with the claimant.

10. In *Homeland Stores*, for example, the district court aptly noted that, where FDIC or RTC fails to repudiate a contract or lease in a timely fashion, or by analogy to the present case, where FDIC decides not to repudiate within a "reasonable time" to permit the injured party to file a claim before the § 1821(d) bar date, FDIC or RTC "step[s] into the shoes of the [contracting party or] lessor for purposes of that [contract or] lease and is subject to claims on the contract. A contract claim by plaintiff is not a creditor action and therefore is not subject to the claims process." *Homeland Stores*, No. 91–1304–PFK, 1992 WL 403092, at *2, 1992 U.S. Dist. LEXIS 20331, at 6. Moreover, § 1821(d)(13)(D)(ii) (withdrawing jurisdiction over "any claim relating to any act or omission of ... the Corporation as receiver") is not to the contrary. In the contract repudiation context, FDIC or RTC acts

the Bank, rather than against the FDIC, it need not (indeed, could not) have been filed prior to the September 6, 1990 bar date, since the FDIC did not repudiate the Bank's agreement with Heno until almost six months *after* the bar date. *See Rechler Partnership v. Resolution Trust Corp.*, No. 90–3091, 1990 U.S. Dist. LEXIS 18714 (D.N.J. Sept. 4, 1990).[11] *But see Harrington v. Federal Deposit Ins. Corp.*, 1993 WL 294850, at p. *7, 1992 U.S. Dist. LEXIS 20822, at pp. 8–9 (D.Mass. Feb. 28, 1992).

Moreover, as further evidence of FIRREA's dichotomous treatment of "claims," the discordance between the applicable "timing" elements in subsections 1821(d) and (e) is noteworthy. In contrast to the fixed bar dates applicable under subsection 1821(d), FIRREA expressly allows FDIC a "reasonable period following [its] appointment" within which to repudiate preexisting contracts of the failed institution. 12 U.S.C. § 1821(e)(2). Of course, subsection 1821(e)(2)'s more pliant "reasonable time" prescription will vary in accordance with the factual circumstances in the particular case, *see Monument Square Assocs. v. Resolution Trust Corp.*, 792 F.Supp. 874, 878, 878 n. 7 (D.Mass.1991), which means that it may or may not exceed the fixed ninety-day bar date set by subsection 1821(d). However, if FIRREA required contracting parties to file anticipatory contract-repudiation claims within the fixed ninety-day bar period set by subsection 1821(d), the "reasonable time" within which FDIC may determine whether to repudiate would be preempted in *every case* by the

180–day deadline imposed under subsection 1821(d)(5)(A)(i) ("Before the end of the 180–day period beginning on the date any claim against a depository institution is filed with the Corporation as receiver, the Corporation shall determine whether to allow or disallow the claim....."). Instead, Congress decided not to superimpose on the subsection 1821(e) contract-repudiation process the fixed deadlines made applicable under subsection 1821(d). *See Monument Square*, 792 F.Supp. at 878 n. 7 (citing H.R.Rep. 54(I), 101st Cong., 1st Sess., 331 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 127, indicating that Congress rejected proposal for a fixed 90–day repudiation-claim deadline under § 1821(e) in favor of "reasonable period" provision). To ignore this deliberate dichotomy would offend a fundamental rule of statutory construction—that the court strive, where possible, to interpret a statute so as to accord "harmonious, comprehensive" meaning to all its provisions. *McCuin v. Secretary of Health and Human Servs.*, 817 F.2d 161, 168 (1st Cir.1987).

■ A Rule 12(b)(6) dismissal is appropriate only " 'if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on *any viable theory*.' " *Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir.1992) (quoting *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990)) (emphasis added); *see Finnern v. Sunday River Skiway Corp.*, 984 F.2d 530, 534 (1st Cir.1993) (noting that dismissal is warranted "[i]f a trial court accepts plaintiff's facts and can envision *no*

---

not in its capacity as "receiver," "such as when it is dealing with creditor actions or marshalling assets," but in its capacity as a successor *party to the pre-existing contract* with the failed financial institution. *Id.* at 7.

**11.** As the district court explained in *Rechler:*

[T]he language of the administrative claims procedure explicitly indicates that it was designed to address pre-Receiver claims against the failed depository institution and not post-Receiver complaints against RTC.

. . . .

In this case, plaintiff's [§ 1821(e)] claim did not exist at the time the Receiver was appointed. At that time the plaintiff did not know, and could not have known, what position the Receiver would take concerning the [continuation of the] lease.

Common sense suggests that at the date of appointment the plaintiff could, in good faith, expect the Receiver to act reasonably and fairly to either repudiate or affirm. Thus, at the date of the appointment, plaintiff had *no claim*. It only ripened when RTC allegedly failed to exercise its statutory responsibility under Section 1821(e), long after the expiration of the time period for filing administrative claims. Taken to its logical or illogical conclusion, defendants' argument would mandate a finding that plaintiff's claim was time barred before it existed.

*Rechler Partnership*, No. 90–3091, 1990 U.S. Dist. LEXIS 18714, at 11 (emphasis added).

Case law involving the statutory powers of RTC is applicable to FDIC. *See* 12 U.S.C. § 1441a(b)(4)(A).

*reasonable application of the law* that would entitle plaintiff to relief. . . .") (emphasis added). Viewed in its most favorable light, the complaint alleges sufficient facts to support a viable theory of recovery under subsection 1821(e)(3)(A), albeit without precise delineation or citation to chapter and verse. It alleges an agreement among Heno, Balcol and the Bank, whereby Balcol would deed the two disputed lots to Heno—which it did—and the Bank would release its first mortgage liens on those lots, and apply $125,-000 from the monies in escrow toward roadwork in the Prospect Heights development. It further alleges that Heno, having fully performed all obligations under the recapitalization agreement, requested FDIC by letter dated December 13, 1990, to honor its recapitalization agreement by releasing the first mortgage liens and returning the escrowed monies "attributable" to [Heno's] participation in the agreement. . . ." *See supra* note 4. In response to an FDIC request for further information on the mortgage lien releases and the escrow account, a second letter was sent to FDIC on February 19, 1991, supporting Heno's requests. Finally, on February 26, 1991, FDIC, for the first time, informed Heno that *the Bank's records relating to this matter had been lost* and that FDIC would neither release the mortgage liens nor remit the escrow monies. Further efforts to persuade FDIC to comply with the terms of the Bank's agreement were unavailing.[12]

### III

### CONCLUSION

On the basis of these allegations, we are unable to conclude that "the plaintiff cannot recover on any viable theory." *Garita Hotel Ltd.*, 958 F.2d at 17. Notwithstanding the failure to articulate a contract-repudiation claim with precision, Heno nonetheless alleged sufficient facts to support a claim for compensatory relief against FDIC for its

February 1991 refusal to release either the Bank's liens on Lots 82 and 111 or Heno's interest in the escrow monies. The requested compensatory relief appears to be expressly authorized under subsection 1821(e)(3)(A) ("actual direct compensatory damages"). Although FIRREA vests FDIC, as receiver, with broad discretion to repudiate burdensome contracts entered into by failed financial institutions, it entitles the aggrieved contracting party to compensatory damages for the breach. Therefore, any failure to file an administrative claim within the subsection 1821(d) bar period did not deprive the district court of jurisdiction to entertain Heno's companion claims for an equitable accounting and compensatory relief.

Finally, our interpretation not only accords due recognition to the clear language of subsection 1821(e), but comports with the established rule of statutory construction that enactments limiting federal court jurisdiction are to be construed narrowly, *see United States v. American Bell Tel. Co.*, 159 U.S. 548, 549–50, 16 S.Ct. 69, 70, 40 L.Ed. 255 (1895), especially where, as here, withholding jurisdiction would preclude an aggrieved party from *any* judicial determination of a serious *administrative deprivation* of property rights, *Interstate Commerce Comm'n. v. Northern P.R. Co.*, 216 U.S. 538, 544, 30 S.Ct. 417, 418, 54 L.Ed. 608 (1910) (words that might be taken to limit jurisdiction are narrowly construed when "dealing with an administrative order that seriously affects property rights").

*The order dismissing appellant's claims for an accounting and compensatory relief is vacated and the case is remanded to the district court for further proceedings. In all other respects, the district court order is affirmed.*

---

12. As the claim for compensatory relief was dismissed for lack of jurisdiction, the district court made no findings relating to whether, or what, Bank records may have been lost. On remand, therefore, appellants may confront a serious problem of proof. *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *see also* 12 U.S.C. § 1823(e). Nevertheless, the "writing" requirement is not jurisdictional. Moreover, appellants are entitled to reasonable discovery, *see generally Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635, 644 (D.N.J.1990), particularly in light of the suggestion that records were lost.